# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

---

ANTHONY AMEROSE,

                                        Plaintiff,                          DECISION & ORDER

                    -vs-                                                    10-CV-6383-CJS-MWP

MONROE COUNTY WATER AUTHORITY,

                                        Defendant.

---

## APPEARANCES

For Plaintiff:                          Christina A. Agola, Esq.
                                        Ryan Charles Woodworth, Esq.
                                        Christina Agola PLLC
                                        1415 Monroe Avenue
                                        Rochester, NY 14618
                                        (585) 262-3320

For Defendant:                          Joseph S. Brown, Esq.
                                        Adam W. Perry, Esq.
                                        Hodgson Russ, LLP
                                        The Guaranty Building
                                        140 Pearl Street Suite 100
                                        Buffalo, NY 14202
                                        (716) 848-1346

## INTRODUCTION

**Siragusa, J.** This Americans with Disabilities Act ("ADA") and New York Human Rights Law ("NYHRL") case is before the Court on Defendant's motion for summary judgment, Apr. 3, 2012, ECF No. 18. For the reasons stated below, Defendant's application is granted and the case is dismissed.

## FACTUAL BACKGROUND

The following facts are taken from the parties' Local Rule 56 statements. The Monroe County Water Authority ("MCWA") is a public benefit corporation under the New York State Public Authorities Law and provides drinking water for households and businesses in Monroe, Genesee, Wayne, Orleans and Livingston Counties in New York. Plaintiff was employed by the MCWA's Facilities, Fleet Maintenance, and Operations Department as a Laborer from June 20, 2005, until his termination on September 23, 2009. Hendrickson Decl. ¶ 12. By way of background, within each of the MCWA's operations center are four basic types of assignments: (1) valve repair; (2) hydrant repair; (3) four-man crew; and (4) serviceman. As a Laborer, Plaintiff worked in an entry-level, unskilled position involving "a variety of routine heavy and light manual labor tasks" that requires "physical endurance." Benshoff Decl. ¶ 5. Plaintiff's position required him to have the "ability to do heavy manual labor, including lifting." *Id.* Moreover, a Laborer is expected to rotate through each of the four of assignments so that he gains the experience necessary to properly perform the duties at any of the assignments, allowing the MCWA to make adjustments to changes in staffing levels as well as meeting the needs of its customers. *Id.* ¶ 12.

When an employee, following a medical leave, is cleared to return to work, by his health care provider with restrictions, the MCWA contends that it uses its best efforts to find available light duty work that can accommodate the employee's work restrictions. Benshoff Decl. ¶ 13; Hendrickson Decl. ¶ 29. However, according to the MCWA, a Laborer who is cleared to return to work with restrictions, such as a restriction on repetitive bending and twisting, or restrictions on lifting no more than 15 pounds, may not return to work as a Laborer in any of the four assignments in the Operations Division. In that regard, the MCWA maintains that the job assignments for a Laborer are too physically demanding to qualify as light duty work. Benshoff Decl. ¶ 14.

Plaintiff, though, contests this assertion, and contends that within the job description of Laborer are a variety of heavy and light manual labor tasks, including the valve crew. Rose Dep. 17:11-14, 18-20; Amerose Aff. ¶¶ 3 & 4; Amerose Dep. 18:2-9, 19-23. The MCWA counters that assignment as a Laborer on the valve crew is not considered to be a light duty position. Benshoff Decl. ¶ 18, since the valve crew is charged with the operation, maintenance and repair of water main valves and its work often requires the crew to locate valves that are four to ten feet below ground. Gaining access to those valves frequently includes removal of manhole covers and using a variety of tools to gain access to the valves in the confined space. Once the workers have access to the valves, turning them is often physically demanding because of the age or condition of the valves.

Many of MCWA's the employees, including Plaintiff, are represented by the Civil Service Employees Association and are entitled to certain rights and procedures established under New York Civil Service Law. Hendrickson Decl. ¶ 4. The MCWA

prohibits all unlawful discrimination in the workplace, including discrimination on the basis of disability, and notices regarding its non-discrimination policies are posted in the workplace and provided to employees as part of orientation and further training sessions. Hendrickson Decl. ¶ 6. MCWA's Policy Manual states that "MCWA will work with each individual to define their [sic] job-related needs and try to accommodate those needs." Hendrickson Decl. ¶ 8 & Ex. B. Policy Manual section 2.06 states that the "employees should make MCWA aware of his or her [sic] need for an accommodation by notifying their Department Head and the Director of Human Resources." Hendrickson Decl. ¶ 119 & Ex. B. The MCWA provides written guidelines for its supervisory employees when discussing an employee's request for an accommodation. Hendrickson Decl. ¶ 10 & Ex. C. Additionally, all supervisors receive periodic training regarding the MCWA's employment policies and procedures. *Id*. ¶ 11.

On October 27, 2005, Plaintiff claimed to have suffered a work-related back injury while using a needle bar to break up dirt. He was placed on a medical leave of absence and received workers' compensation benefits. During his leave, Plaintiff continued to receive his regular wages and benefits under the collective bargaining agreement, and regularly visited a doctor for evaluation. Hendrickson Decl. ¶ 13; Amerose Dep. at 21:1-23:3. Plaintiff returned to his position as a Laborer on November 14, 2005, with no restrictions. Hendrickson Decl. ¶ 14; Amerose Dep. 23:7-24:9. Approximately three years later, on October 8, 2008, Plaintiff aggravated his October 27, 2005, injury while working as a Laborer on the valve crew. He was again placed on a medical leave of absence and received workers' compensation benefits. Hendrickson Decl. ¶ 15; Amerose Dep. 24:10-20, 28:6-9. After initially receiving physical therapy and

cortisone shots to treat his back injury, Plaintiff had disk fusion surgery in March 2009. Amerose Dep. at 28:10-30:3.

Diane Hendrickson, Defendant's Director of Human Resources ("Hendrickson") sent Plaintiff a letter dated July 30, 2009, informing him that he would be terminated if he could not return to work by September 20, 2009, as that date marked the end of Plaintiff's one-year workers' compensation leave of absence. Hendrickson Decl. ¶ 16 & Ex. D.; Amerose Dep. 30:22-32:5. Shortly after July 30, 2009, Plaintiff and Hendrickson spoke by telephone confirming Plaintiff received the letter and discussing the possibility of his return to work. Hendrickson Decl. ¶ 19; Amerose Dep. 32:14-22, 34:11-35:16. Defendant contends that Hendrickson informed Plaintiff that the MCWA would work with him to find a job assignment, if possible, that fit within any restrictions suggested by his doctor. Hendrickson Decl. ¶ 19. Plaintiff, in contrast, maintains that Hendrickson informed him that his return to work must be without restrictions. On September 11, 2009, Hendrickson spoke to Plaintiff again about his anticipated return to work on Monday, September 14, 2009. Plaintiff informed Hendrickson that his doctor had given him a note stating he could return to work without restrictions. Hendrickson Decl. ¶ 20. Although Plaintiff contests this assertion of fact, as more fully discussed below, he provides no evidentiary proof in admissible form to support his contention that his doctor listed no restrictions *only* because Hendrickson assured Plaintiff that she would find him work that would accommodate his disability. In fact, Plaintiff's doctor's treatment notes, dated September 8, 2009, submitted by the MCWA, contains this sentence: "[Plaintiff] is totally temporarily disabled but as of 09/14/09 he will have no degree of disability." Brown Reply Decl. Ex. A.

During a telephone conversation on September 11, 2009, Plaintiff asked Hendrickson if he was going to be assigned to the valve crew. She informed him that there was no position available on the valve crew at that time and that he would instead be assigned to a four-man crew. Hendrickson Decl. ¶ 21; Amerose Dep. 43:18-45:10. Moreover, at his deposition, Plaintiff was asked the following questions and made the following responses:

Q. [Y]ou didn't mention any of the specific restrictions—

A. No.

Q. —that you had discussed with your doctor?

A. No, we did not.

Q. As far as you know, the only medical documentation that Ms. Hendrickson had was Exhibit 3 which said no restriction?

A. Correct.

Q. Did you expect Ms. Hendrickson to guess as to what restrictions you needed?

A: No.

Q. Did you want her to take a guess?

A. No.

Q. Isn't that the reason you go to a doctor, to find out what restrictions you need, so that can be communicated to the employer?

A. Absolutely.

Amerose Dep. at 47:3-21. In response to this section of Plaintiff's deposition testimony, Plaintiff refers to the following section, also from his deposition:

Q. Did you tell Ms. Hendrickson that Dr. Whitbeck had suggested some restrictions of any sort?

A: I believe I did.

Q. And which ones did you tell her about?

A. I believe I explained to her that they wanted me just to come back with restrictions, and I had told them that I needed my job. And I wanted to come back—I needed to come back without restrictions, or I would lose my job.

Q. Did you—you didn't mention any of the specific restrictions—

A. No.

Q. —that you had discussed with your doctor?

A. No, we did not.

Q. And as far as you know, the only medical documentation that Ms. Hendrickson had was Exhibit 3, which said no restrictions?

A. Correct.

\* \* \* \*

Q. So going back to this conversation you have with Ms. Hendrickson were you were informed that you are going to be going back to the four-man crew, how does that conversation end?

A. I just accepted what I had to do. I needed my job.

Q. So you told her that you would be reporting to work the following Monday to work on the four-man crew?

A: That's correct.

Amerose Dep. at 46:17-47:11, 47:22-48:7.

Plaintiff also testified at his deposition that he believed there were office positions available to him at the MCWA where he could have done light duty work and that the basis for his belief was, "Oh, I just assumed that—you know, obviously I got hurt on the job. I assumed that they would take care of me at least for a few weeks, whether it is running forms or, you know, going out in inspecting things—you know, different areas." Amerose Dep. 54:25-55:5. However, to counter the statement that he "assumed that they would take care of" him, Plaintiff argues that his testimony, "[a]s I recall, she said she is going to do the best of her ability to ease me back into my job," Amerose Dep. at 35:4-5, shows that he did not just assume light duty work was available.

Plaintiff returned to work on Monday, September 14, 2009, with a statement from his doctor releasing him to work as a Laboror without restrictions. Hendrickson Decl. ¶ 23 & Ex. E. Plaintiff's supervisor was Steve Batz ("Batz"). Plaintiff provided Batz a doctor's note listing no restrictions. Furthermore, Plaintiff did not inform Batz that he had any restrictions on his ability to work. Amerose Dep. 56:14-57:21. Jim Clark ("Clark") was the foreman of the four-man crew to which Plaintiff was assigned. Plaintiff did not tell Clark that he had any restrictions on his work activities. Amerose Dep. 58:13-24. At the end of the workday on September 14, 2009, Plaintiff had no discussions with Batz concerning his back, nor did he contact his doctor. Amerose Dep. 62:25-63:6.

The following day, September 15, 2009, Plaintiff returned to work and testified at his deposition that he was not experiencing any back pain. Amerose Dep. 62:19-24. Curiously, Plaintiff disputes his deposition testimony in a June 5, 2012, affidavit in which

he states, "[u]pon return to work the morning of September 15, 2009, I continued to experience severe back pain." Amerose Aff. ¶ 27.[1] Plaintiff did not tell Batz, Clark, or Hendrickson about any difficulties with his back when he started his shift, nor did you tell anyone that he needed any type of light duty. Plaintiff operated a jackhammer for about five minutes before asking to be relieved. Amerose Dep. 66:20-67:4. However, he did not talk to anyone about his back hurting at that point, but just walked away. *Id*. & 67:9-11. Later, he returned to the jackhammer and used it for a few more minutes. *Id*. 67:14-22. It was not until the end of his shift that Plaintiff told Batz, his supervisor, that his back was sore. *Id*. 69:3-70:10, 71:12-20.

On September 16, 2009, Plaintiff returned to work with a note on a prescription pad dated September 15, 2009, by Michael S. Reichert RPA-C,[2] which stated, "Mr. Amerose experienced a reexacerbation of his back pain today and is considered to be totally temporally disabled as of today until reeval[uation] at this office." Pl.'s Rule 56 Statement, Vol. II, Ex. D; Hendrickson Decl. ¶ 27 & Ex. F. Then, on September 17, 2009, Plaintiff was re-evaluated by his doctor and authorized return to work on September 21, 2009, with several restrictions: (1) no repetitive bending or twisting; (2) no lifting greater than 10-15 pounds; (3) no repetitive squatting or kneeling; (4) no

---

[1]It is well settled that the party opposing summary judgment may not create a triable issue of fact "merely by submitting an affidavit that disputes his own prior sworn testimony." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) (citations omitted). Rather, such affidavits are to be disregarded. *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) (citations omitted).

[2]Michael S. Reichert's name appears in type on the prescription pad with the initials "RPA-C" following his name. On the other side of the top of the pad is Dr. Whitbeck's name. Evidently, Mr. Reichert is a physician's assistant in Dr. Whitbeck's office.

repetitive work above the shoulders; (5) no repetitive bending of the back; and (6) no forceful pulling or pushing. Hendrickson Decl. ¶ 28 & Ex. G.

Defendant contends that because of the restrictions, Plaintiff could not perform the essential functions of his position as a Laborer, with or without a reasonable accommodation. Hendrickson Decl. ¶ 32. Plaintiff disputes this contention, asserting that, since the job description of a Laborer includes light manual labor tasks, there must have been some tasks in the light duty range for which he would have been qualified.

Upon receiving a form completed by Plaintiff's doctor, Hendrickson contends she searched for vacancies in the MCWA to determine whether a position was available for Plaintiff. Hendrickson Decl. ¶ 31. Plaintiff disagrees and states that Hendrickson informed him at a September 22, 2009, meeting, that his termination date would be September 23, 2009. Further, Plaintiff contends that at that same meeting, then-MCWA Director Ed Marianetti ("Marianetti") said to him, "taking one look at you, there is nothing here for you" and "we cannot take a chance because you are a liability." Amerose Dep. at 84:20-22. However, Plaintiff does not dispute that Hendrickson contacted supervisors from the Customer Service/Billing, Meter, and Engineering Departments to determine whether any of those departments could have used any temporary assistance for assignments that were consistent with Plaintiff's work restrictions. Hendrickson also contacted Raymond Benshoff, Director of Facilities, Fleet Maintenance, and Operations, to see if his department had any positions available to accommodate Plaintiff's work restrictions. Hendrickson Decl. ¶ 33; Benshoff Decl. ¶ 24. No positions were available.

Defendant contends that Plaintiff was placed on a medical leave of absence until his termination date of September 23, 2009. However, Plaintiff maintains that he was terminated following Marianetti's remarks that nothing was available for him and that he was a liability. In a letter dated September 25, 2009, Plaintiff was informed in writing of his termination date, and the status of his benefits following separation. Hendrickson Decl. ¶ 40 & Ex. H.; Amerose Dep. 87:17-88:7. Defendant argues that it terminated Plaintiff solely because he had been on leave for a period of more than one year under New York Civil Service Law section 71 and that there were no light duty positions for Plaintiff after he was re-injured on September 15, 2009. Plaintiff disputes this contention, asserting that Hendrickson said that if Plaintiff's doctor had released some of his restrictions, then Plaintiff could have returned to work. Hendrickson Dep. 74:17-22. Hendrickson further related during her deposition testimony that Marianetti asked Plaintiff what he wanted, and that Plaintiff responded, "Well, I would like to have a job if you could get me a job where I did not have to work." *Id*. 75:5-9. According to Hendrickson, Marianetti then said to Plaintiff, "Looking at you the way you walked in here... you would not be able to do my job.... You know, my concern is that you are going to injure yourself further.... There is nothing we can do to accommodate." Id. 75:13-70.

Plaintiff does not dispute that the MCWA has terminated other employees under section 71 who were absent from work for a cumulative period of one year and for whom there were no other positions available. Upon his termination, Plaintiff continued to receive workers' compensation benefits for his temporary partial disability. Since his termination, Plaintiff has not requested a medical examination, nor has he re-applied for

his position, or any position at the MCWA. Hendrickson Decl.¶¶ 43 & 45. Plaintiff did apply for Social Security disability benefits following his termination, and the Social Security Administration ultimately determined that he was disabled as of October 9, 2008, and continuing through April 4, 2011, awarding him $17,158 in disability benefits for that time period. Amerose Dep. 101:4-103:10.

In his Local Rule 56 statement, Plaintiff reiterates his contention that the Laborer position included light duty work, that he maintained a satisfactory performance record throughout his tenure, that for a period of one year as a Laborer, Plaintiff worked fire hydrant duties involving inspection of fire hydrants, and that, in that regard, inspecting fire hydrants did not involve any repetitive bending or twisting, heavy lifting, repetitive squatting or kneeling, repetitive work above the shoulders, bending of the back, or forceful tolling or pushing. Plaintiff provides further examples of tasks he performed as a Laborer, such as computer programming, that did not involve the kind of work that would have violated his doctor's restrictions. Plaintiff also contends that past employees, including Laborers who were injured on the job, who were out on workers' compensation, and thereafter who returned to work, were offered light duty positions. Amerose Dep. 53:12-24. However, in his deposition testimony, Plaintiff was asked the following questions and gave the following responses:

Q. [B]efore your return to work on the 14th, September 14th, did you believe there were any office positions were you could have done light duty work?

A: Well, sure.

Q. And what was your basis for that belief?

A. Oh, I just assumed that—you know, obviously I got hurt on the job. I assumed that they would take care of me at least for a few weeks, whether it is running forms or, you know, going out and inspecting things—you know, different areas.

Q. You just assumed; it's not something you looked into?

A. No, I didn't.

Q. You don't know if, in fact, there were any light duty positions available as of September 14, 2009?

A. No, I did not know.

Amerose Dep. 54:20-55:12.

Plaintiff also points to the deposition testimony of James Clark in which he was asked the following question and gave the following response:

Q. You go on to say that he had shown you a lot of body language all day that his back was not 100 percent, holding his back, walking stiffly, bending over knees very carefully. Anything besides holding his back, walking stiffly or bending over that he did that you interpreted as signs of him having difficulty with his back?

A. No, nothing else.

Clark Dep. 65:16-23.

## STANDARDS OF LAW

### *Summary Judgment*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the

burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the non–moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc*., 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303,

308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S.Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Of course, it is well settled that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, the general rule holds and a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars which, if believed, would show

discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### Americans with Disabilities Act & New York Human Rights Law

The general legal principles applicable to ADA disability discrimination claims are clear:

> A plaintiff suing under the ADA for disability discrimination bears the burden of establishing a prima facie case. In so-called reasonable-accommodation cases, such as this one, the plaintiff's burden requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 183-184 (2d Cir. 2006) (citation and internal quotations omitted). The ADA and NYHRL "are governed by the same legal standards," therefore, "although [the Court's] discussion will focus on [the ADA, the] decision pertains equally to [the NYHRL] claim." *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004).

With regard to Plaintiff's argument in his memorandum of law that the MCWA regarded him as disabled, the Second Circuit recently pointed out a change in the ADA:

> In 2008, however, Congress passed the ADA Amendments Act, which substantially re-worked the language of Section 12102. Among other things, what was formerly subsection (2)(C) became subsection (1)(C) and was amended to include the following parenthetical: "as described in paragraph (3)." *Compare* 42 U.S.C. § 12102 (2006) with ADA Amendments Act § 4(a). Paragraph (3), in turn, was completely new and reads in relevant part:
>
> > (3) Regarded as having such an impairment

For purposes of paragraph (1)(C):

> (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment *whether or not* the impairment limits *or is perceived to limit* a major life activity.

*Id*. (emphasis added). Lest there be any confusion about the amendment's effect on subsection (1)(C), the Committee Report states:

> The Committee therefore restores Congress's original intent by making clear that an individual meets the requirement of "being regarded as having such an impairment" if the individual shows that an action (*e.g.* disqualification from a job, program, or service) was taken because of an actual or perceived impairment, *whether or not* that impairment actually limits *or is believed to limit* a major life activity.

H.R. Rep. No. 110-730, pt. 1, at 14 (2008) (emphasis added).

*Hilton v. Wright*, 673 F.3d 120, 128-129 (2d Cir. 2012).

### *McDonnell Douglas Burden-Shifting Analysis*

Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext.

*McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (internal quotation marks and citation omitted).

**ANALYSIS**

Counts I and II of Plaintiff's complaint set out claims for reasonable accommoda-tion and discriminatory discharge under the ADA and NYSHRL. Plaintiff maintains that in order to return to full time work, he was compelled to ensure that his doctor's note had no restrictions. Pl.'s Mem. of Law. at 3. He argues that, "[i]t was clear that in Dr. Whitbeck's medical opinion, Plaintiff was in fact disabled in that he should have been returned to work with medical restrictions in place." *Id*. at 4. However, nothing in the evidentiary proof before the Court on this motion shows that Plaintiff's doctor considered him to be disabled. Plaintiff has not submitted any affidavit or deposition testimony from the doctor, nor has he submitted any medical records. Rather, he relies on the medical note, Pl.'s Rule 56 Statement, Vol. II, Ex. C, and observations of Clark. *Id*. at 5. The medical note from M. Gordon Whitbeck Jr., M.D., consists of a form which is dated September 8, 2009, and indicates that Plaintiff "May return without restrictions on: 9-14-09." Dr. Whitbeck made no marks in the section entitled, "Degree of Disability."

As for Clark's observations, they fail to provide evidentiary proof in admissible form that Plaintiff was disabled. Clark interpreted Plaintiff's body language as indicating that his back was sore. This is far from proof that Plaintiff suffered from an impairment that substantially limited a major life activity. Clark testified that Plaintiff never reported any disabling condition to him, and the proof on this motion is that Plaintiff said nothing until the end of his second day back at work, September 15, 2009, when he told Batz, his supervisor, that his back was sore. It was not until the following day, September 16, 2009, that Plaintiff returned to work with a note stating that he was temporally totally disabled. Therefore, as of the end of the working day on September 15, 2009, the

evidence does not show that Plaintiff was disabled, or that he was perceived as disabled by MCWA. On September 17, 2009, as indicated above, Plaintiff was cleared by his doctor to return to work on September 21, 2009, but with a number of restrictions.

Turning to the meeting on September 22, 2009, with Hendrickson, Marianetti and Plaintiff, Plaintiff testified that Marianetti said to him, "taking one look at you, there is nothing here for you," and, "we can't take a chance because you're a liability. If you were to fall or trip or...." Amerose Dep. 84:20–22, 124:7–21. Plaintiff also testified that he said to Marianetti, "I'm just in a lot of pain. I'm basically coming in to you guys and seeing if there's something that could be done to save my job." *Id*. 84:15–18. Subsequently, Plaintiff was asked the following questions and gave the following answers at his deposition:

> Q. I think you said Mr. Marianetti told you you were a liability, because you could get injured again; is that what he told you?
>
> A. Yeah, due to the state that I was in, they didn't want to take a chance with me being injured. As it was, they said I was a liability because I could do anything and be permanently injured, so they couldn't afford to take that chance.
>
> Q. And it was also possible if you had gone back to work in the condition that you were in, that if you were working on a four-man crew with a team of other individuals, you could have injured them if you weren't able to perform your job; correct?
>
> A. Correct.

Amerose Dep. 124:14–125:3. Following that exchange, Plaintiff was asked what accommodations he believed the MCWA should have provided to him that it did not,

and he responded, "they could have tried to put me somewhere for the time being." *Id*. 125:8–9. He then suggested, "[t]here's all kinds of office, you know, could have worked with somebody just being an assistant," and "I could have went [sic] back to what I was doing at Shoremont, at the water treatment plant…. I was somebody's assistant." *Id*. 125:8–9 & 125:18–21. When asked if he knew whether any position was available at Shoremont, he responded, "[t]here wasn't any position." *Id*. 123:24. When asked the basis for his belief he could have been put into an office position as an assistant, he responded, "[w]ell, there wasn't, but I just assumed as an employee they could have helped me out by putting me somewhere just to get back in a working condition." *Id*. 126:12–14. However, Plaintiff has produced no evidence identifying a vacant position into which he could have been transferred with duties he was capable of performing with, or without, a reasonable accommodation. *See, Jackan v. New York State DOL*, 205 F.3d 562, 566 (2d Cir. 2000) ("We hold that, in order to recover under the ADA or the Rehabilitation Act for a failure to reasonably accommodate by transfer, a plaintiff bears the burden of establishing that a vacancy existed into which he or she might have been transferred."). Further, Plaintiff never requested an accommodation on September 14, 2009, when he returned to work with his doctor's note stating that he had no restrictions, or on September 15, 2009, when he returned to work after having worked a full shift the previous day. "An employer's duty to accommodate an employee's disability is ordinarily activated by a request from the employee…and the request must be 'sufficiently direct and specific' to give the employer notice of the needed accommodation…."*Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 129 (1st Cir. 2009). The Second Circuit's decision in *Miletta v. Waste Mgmt.*, No. 01-9397, 46 Fed. Appx.

31 (2d Cir. Sept. 16, 2002) (unpublished), is instructive. There the plaintiff, Miletta, argued that the defendant, Waste Management,

> should have either transferred him to an unspecified "office" position or created a new "office" position for him. It is undisputed, however, that Miletta never requested that Waste Management take either of these steps, and that he never informed Waste Management that he was ready and able to return to work in any capacity. Indeed, the disability claim forms that Miletta had provided to Waste Management all indicated that he would never be able to return to work in any capacity. In light of these facts, Waste Management was under no obligation to transfer Miletta to a different position or to create a new position for him. *See, e.g., Sidor v. Reno*, 1997 U.S. Dist. LEXIS 14260, No. 95 Civ. 9588(KMW), 1997 WL 582846, at *6 (S.D.N.Y. Sept. 19, 1997) ("it is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one") (citation and internal quotations omitted). Thus, as the District Court correctly found, Miletta cannot make out a prima facie case under the ADA.

*Miletta*, 46 Fed. Appx. at 32.

Assuming for the purpose of argument that Plaintiff either suffered from a disability as defined under the ADA, or was perceived by the MCWA to have so suffered, his contention that he was terminated solely because of his disability is contradicted by his own testimony. When he returned to work on September 21, 2009, Plaintiff proffered a note from his doctor listing a number of restrictions on a form called Fitness for Work/Duty Report. Hendrickson Decl. Ex. G. Dr. Whitbeck indicated by checking "Yes," or "No," that Plaintiff possessed the following Work/Duty Capabilities. He indicated Plaintiff was capable of: prolonged walking or standing; prolonged sitting; repetitive twisting of his wrists; driving a vehicle and working outdoors; climbing stairs; and lifting up to 15 pounds. Dr. Whitbeck also indicated Plaintiff was not capable of: repetitive squatting or kneeling; repetitive work above his shoulders; repetitive bending

of his back; and forceful pushing and pulling. *Id*. The MCWA's job description for the position of Laborer precluded Plaintiff from performing that job with, or without, a reasonable accommodation. The position required light *and* heavy duty work, including lifting. Behshoff Decl. ¶¶ 13–15 & Ex. A. Plaintiff refers to Hendrickson's testimony that on September 22, 2009, she asked him "if his doctor has released any of his restrictions," because "[i]f he had released some of the restrictions, then he would have been able to come back to work." Hendrickson Dep. 74:17–22. This statement by Hendrickson does not show discrimination, rather, it shows that she was attempting to place Plaintiff in an available job at MCWA. Plaintiff has failed to make a prima facie case of disability discrimination.

Even if the Court assumes, for the sake of argument, that Plaintiff did make a prima facie case of discrimination, MCWA has proffered a non-discriminatory reason for Plaintiff's termination. Specifically, the reason proffered by MCWA for terminating Plaintiff was that he had been out on disability for a cumulative one year period, pursuant to N.Y. Civil Service Law section 71. Plaintiff has not produced evidence to carry his burden of persuasion that the proffered reason is a pretext. Further, MCWA has shown that Plaintiff will be unable to carry his burden of proof. Therefore, MCWA is entitled to judgment on Plaintiff's discrimination claim.

**CONCLUSION**

For the reasons stated above, Defendant MCWA's motion for summary judgment, Apr. 3, 2012, ECF No. 18, is granted. The Clerk is directed to enter judgment for Defendant and close this case.

IT IS SO ORDERED.

Dated:  November 1, 2012
         Rochester, New York

              ENTER:

                         /s/ Charles J. Siragusa
                         CHARLES J. SIRAGUSA
                         United States District Judge